We welcome you here today and just ask you to observe our traffic light system, which gives you marks off your 20 minutes, giving you two minutes with a yellow light to conclude. And at the end of the red light, please stop talking unless a court is asking a question. We also appreciate record citations because we've done the briefs and record excerpts. We may not have gone into the entire record. The first case of the morning is No. 22-20515, United States v. Pierre. And we'll hear from Mr. Kelsey. May it please the Court. The U.S. Supreme Court issued a landmark 9-0 decision shortly after Dr. Pierre's trial. In that decision, the Court set aside a century of precedent regarding the jury instruction, the key operative language in the jury instruction in this case. And they finally recognized that it omitted the mens rea element, any and all mens rea, criminal mens rea, in the instruction. This was a plain, obvious, harmful, and an error that substantially affected Dr. Pierre's rights. Sadly, he did not object at trial. We contend that the error was preserved. We also contend that it was a plain error. We objected in writing, and it was referenced during the charge conference, albeit not with magic words. In fact, the trial counsel, who was very exhausted, referred to the conference as a voir dire. But in the whole of the record, in all fairness, I believe he referenced the written objections. And to enhance the fairness issue, shortly after trial, the exact same proposed charge and written objections were argued before the judge, and he denied them, which we contend would satisfy the spirit of Rule 52, that the judge not be sandbagged and that objections be timely made. So we believe it would be grossly unfair in this particular context to find that it was not preserved. Be that as it may, we think it's clearly a plain error. The fact that it was an error, I believe that the government has conceded it or will concede it. There have been a couple of other cases in which the government has openly conceded that the exact same language was error post-ruin. The obviousness of it, I believe, is on the face of the jury charge. It is an unusually, among these cases, erroneous charge. It three or four times, it emphasizes the error, which is that it does not require the criminal mens rea. Objective intent. Correct, Your Honor. It refers to an objective, generally accepted medical standard, which to me is synonymous with negligence. The harm, the fact that it was harmful and or substantially affected my client's rights, depending on how the preservation issue is decided, we think is also obvious. I can't imagine how having a negligence trial instead of a criminal trial could not affect my client's rights and could not permeate every aspect of the trial in a fundamental way. Well, the point here is the government now argues that the conspiracy instruction rendered the error on the substantive count harmless. Your Honor, I have scratched my head over that. I cannot understand. This is kind of a crim law one day one issue, how you can have a conspiracy to be negligent. You can't bootstrap a crime using a pre-floating conspiracy instruction. I would point out that this particular charge was very, it was the conspiracy instruction imported all of the erroneous instructions. It is duplicated in the substantive counts and the conspiracy counts. It wasn't just a plain vanilla conspiracy charge describing some, you know, knowing illegal purpose. It starts by saying the purpose was 841, which we're going to define using this regulatory jargon and this erroneous language. And so I can't, for the life of me, understand how that could not be the exact same error. Well, it said he knowingly entered the conspiracy and I forget the, I'm trying to find the magic words here. Knowing to do, it mentioned unlawful. I know that. The instruction was, quote, made an agreement to unlawfully distribute or dispense a controlled substance outside the scope of professional practice or without a legitimate medical purpose. So that's, I think that's the, correct me if I'm wrong, I think that's the conspiracy charge. I think that's a key part of it. Yeah. In our, in our decision, Ajayi from fairly recently, I think, a few months ago, it seems that, I mean, can you, the government says that supports their argument about the conspiracy charge, correcting, mitigating, rendering harmless, any error on the substantive count. Do you, can you distinguish that case or? Well, in that case, it was conceded that the conspiracy charge was, was sufficient. Ajayi, like a couple of other cases that have cropped up, are very different from this case in that they involved a long string of counts of other types of fraud, RICO, health care fraud, money laundering, conspiracy to money laundering, all of these were conspiracies. And so, you know, Ajayi carefully limited that to the facts and the facts in that case were entirely dissimilar. We would point to the Tenth Circuit's decision on remand in Cannes, which that charge was exactly, well, I would even, I would go further, but it, it was much closer to the charge in this case. It had the key disjunctive or, which plainly allowed the jury to convict based on the objective and not the subjective prong. And so, in Cannes, the Tenth Circuit said this is exactly the Supreme Court's language and that the conspiracy charge could not be bootstrapped, you know, without the predicate, a valid predicate. Do you think Ajayi is distinguishable and you think Cannes from the Tenth Circuit is a better? Yes, Your Honor. Thank you. With respect to the harm, I think Justice Kavanaugh and Justice Gorsuch put it best. In a case like this, you're going to have two experts and they're going to describe the, this medical standard. And as Justice Gorsuch put it, based on this charge, as soon as the jury found that the doctor went outside the bounds of accepted, generally accepted standards, that individual goes to prison, straight to prison, do not pass go. So how do you assess, how does a court assess an error like that? In the government's briefing in their letter, they dig a little deeper into the plain error standard. And I didn't have space, but I want to alert the court or remind the court there are two basic decisions in the 90s from Justice Rehnquist's decision in Nieder and Justice Scalia's decision in Sullivan, which describes harm in jury instructions of this kind. And so basically, without delving too deep into that, we contend Justice Scalia had it right in a case such as this. What does the Constitution say about the role of courts in going back and surmising what, how the jury would have ruled if a proper charge had been given, given such a fundamental error as, you know, whether this is a negligence case or a criminal case. So that, one, I understand, you know, those cases are bouncing around still in this court and the language seems to vary, but I, you know, a trial error versus a structural error. The bottom line is you can, this is a type of harm, which is, it's automatically harmful. It automatically affects the defendant's rights because it, from the very framework of the trial from beginning to end, you know, the jury ends up with this very softball question and they're just balancing two experts, right, and the government actually had, they had a kind of, their expert and their law enforcement officers with their expertise were repeating a kind of profile, which was their standard. And then our case, my client's case, was largely his expert and I would, if you point to one And if you read that, I can't imagine how it can even be contended that there's overwhelming evidence and that, you know, to support the conviction on the facts to, you know, suggest that there, it could not possibly or did not substantially affect my client's rights. It looks to me as if in the Kahn case the error was preserved. And if we were to determine that this, your client didn't, counsel did not object to the jury instruction, how do you satisfy the plain error standard here? So I actually think the language in Kahn, it would, it applies equally to plain error and harmful error. And you know, the gradation between showing harm and us showing that there, there's a reasonable probability that it affected the outcome, I mean, in this case, I don't think it's close. I think, I think that's a very similar analysis. And I think that going, going back to our client's expert. So he is the only evidence in this case from the perspective of the doctor. Again, this is subjective intent here of a frontline addiction specialist. Well, I think there's a lot of evidence about the crime that was, crimes that were being committed here. There's a lot of evidence of, say, it's like a million pills in six months or something, right? Well, so we would, what that evidence shows, it fits perfectly within a profile of potential, say, drug abuse. There clearly, this is an area of, there's potential drug abuse and what our client's expert explains is now, as of today at least, the government and its medical guidelines and it's just the reality, the elephant in the room of just opioid treatment is that a doctor, they cannot turn the patient out on the street. They cannot taper, they have to maintain. And so our expert explained, you know, walks through that and at the end of that, you know, you can imagine, you know, if the jury's question is simply, what's the accepted, what's, we have to- I understand. I agree with you completely. It's a terrible thing to turn a violation that, where you should have subjective knowledge of the illegality into basically a regulatory crime. That's a very significant distinction. I'm just, I just don't recall how that plays out on plain error, but- Well- If it is on plain error, then on the fourth prong, I believe we have decisions from our circuit that say we also should look to see the overall weight of the evidence, and if there's overwhelming evidence of guilt, we can exercise our discretion not to recognize the error. So- Well, yeah, that's where we push back on the overwhelming evidence. And we do, I would point back to this issue in Sullivan, where in Sullivan, it was a jury instruction on the standard of the burden of proof that affected, you know, the whole framework of the trial. In Nieder, it was, you know, one element, and the government points to a string of cases which are, you know, they're elements which are, say, a specific intent or, you know, a deliberate ignorance instruction. Those types of things are in a different category. We believe we're in the Sullivan bucket, and these types of errors are fundamental, and they require, in our reading of Sullivan, that the case be vacated. That's kind of the end of the analysis. I would like to hear the latest from the government and reserve my time- You will in 15 seconds. For rebuttal. Thank you, Your Honors. Okay. Thanks a lot. Mr. Romano. Good morning, and may it please the Court. John Alex Romano on behalf of the United States. With respect to the claim of jury instruction error, the government's argument is threefold. First, the claim is unpreserved, so plain error review applies. Second, there was no error in the conspiracy instructions. They were adequate under Ruan. And third, while there was error in the substantive count instructions, Defendant Pierre cannot satisfy the remaining prongs for relief under the plain error standard. Now, with respect to the first question, the claim is unpreserved because Defendant Pierre did not make a Ruan-related objection to the jury charge or object to the district court's failure to give his proposed instructions, assuming they were even sort of adequate. If the court looks at the transcript of the jury conference, which is at 1763 to 65, the only objection that was made to the actual charge that the court gave was to the giving of an aiding and abetting instruction. There was no Ruan-related objection. Now, my opponent referenced counsel's reference during a pre-charge conference to the proposed jury instructions. And that occurred at record site 1508 to 1510. But if the court looks at those pages of the record, Pierre's counsel was only referencing his proposed submission of jury instructions that were submitted before trial in the context of the district court's decision not to grant the government, the government's request for deliberate ignorance instruction. It was just back and forth between the government and the district court. And the district court said, I'm not buying it. We really have a tough job to try to persuade the government. At that point, Pierre's counsel chimed in and said, yes, we submitted a, he called it a voir dire on that. We think that's right. So even that passing reference to the previously submitted proposed instructions was narrow. It wasn't sort of related to this Ruan issue. So for those reasons, we think plain error review applies. Now, moving to the conspiracy instructions, we do think that the instructions here were materially the same as the ones that, the conspiracy instructions in Ajayi. It sat on a case about this last month. Yes. I'm familiar with that case, Your Honor. Okay. Yeah. And I think that they were similar to the instructions in that case. And the reason why we think they're adequate, the instructions in this case, was if the court looks at the three, you know, when the district court gets down to sort of the nitty-gritty and tells the jury, these are the three things you need to find if you want to convict a defendant, Pierre, of conspiracy. I don't, I just, I have a difficult time buying that because, as I expressed in oral argument at the last hearing, the, an unlawful agreement is circular to the extent that it incorporates the error, the Ruan error and the substantive charge. And I understand Your Honor's point. I don't think that happened here because when the court looks at the first element, you know, when the district court says, jury, you have to find first that Pierre made an agreement to unlawfully distribute or dispense outside the scope of professional practice without a legitimate medical purpose. So the court there defined the legal object of the conspiracy, the specificity. It wasn't just you have to make an agreement to unlawfully distribute. You have to agree to act outside the scope of professional practice. Yes. But there are reasons, there are other reasons than violating the law that may lead one to prescribe something outside the reasonable scope. And one of those might even be that the patient was lying to the, to the doctor. And just, I understand Your Honor, just to go back to Ruan, right, Ruan says, you know, it is a crime if, you know, provided there's a finding that the prescriber knew he was prescribing outside the scope of professional practice or knew he was doing so without a legitimate medical purpose or that he intended to do so. So that's what Ruan holds, as this court, of course, knows. And my argument is that, you know, each of the three elements, sort of, of the conspiracy instructions satisfy that standard. A defendant who agrees to act outside the scope of professional practice or without a legitimate medical purpose can't then turn around and say, I didn't know I was going to be doing that in connection with the conspiracy. And if the court looks at the second element of the conspiracy instruction, the jury had to find that Defendant Pierre knew the unlawful purpose of the plan as the court had just defined it, right? And then the third element reinforces this yet more. It says you have to find that the defendant joined in the agreement willfully with the intent to further the unlawful purpose. So I take Your Honor's point, Judge Jones, government does admit that these conspiracy instructions were adequate. We think they are materially the same ones that were upheld by this court in Adjahi. And just to address my— Well, the difference in Adjahi is that the defendant had, as Mr. Kelsey pointed out, the defendant acknowledged that the conspiracy instruction was appropriate. Right. But this court, the panel in Adjahi, didn't just, sort of, take that concession uncritically because we know then there are, of course, two parts to Adjahi, right? Then the court goes on to say, you know, the substantive counts were correct, were not error either. And the reason the court did so was based on the adequacy of the conspiracy instructions. So we know that the panel in Adjahi concluded independently of the concession made by Adjahi's counsel that we know that the panel found that the conspiracy instructions in that case were adequate because it couldn't have used them, right, to support the— To me, it's, sort of, like, do two wrongs make a right, to the extent that the conspiracy instruction necessarily incorporates the error in the substantive one. Yes, Your Honor. And I'm happy to move on to the substantive count instructions. And I would just say, you know, we think Adjahi is controlling the conspiracy instructions. We'd also point— If I could just add one thing. Sure. I may have, when I was—I'm just checking Adjahi here to see exactly what it did. And you may have just said this, and I missed it, and I apologize, but, yes, there was, it says that oral argument of Adjahi's counsel acknowledged that the individual conspiracy instruction was appropriate but disputed the holistic sufficiency of the instructions. You may have just said that. So there was a question in that case that the panel had to—it wasn't just on concession. Correct. Correct, Your Honor. And when the court then goes on to say, you know, for case-specific reasons, it's really referred—it's in the portion of the decision referencing the substantive count instructions. But how does that give knowledge? How does that speak to the fellow's subjective knowledge? Because if you—he conspired to do something illegal. What was that illegal thing? He conspired to distribute these drugs illegally. But that's not what the instruction said, with respect, Your Honor. You know, it says— Where does it add something more that means subjectively knew that the pill mill was illegal? Again, and so we're on 1938 of the record. It's element one. There's an agreement, and then the agreement is defined not just to distribute or dispense unlawfully but to do so—an agreement to act outside the scope of professional practice. But outside the scope of—as I'm telling you, that does not capture the mens rea of illegality. When you make an agreement to do so, it does. And when the second element then says you have to know the unlawful purpose of your plan, you have to know the unlawful purpose of the plan to act outside the scope of professional practice or to act without medical legitimacy. And then when the third element says you have to intend to do that— Doctors could have gone to jail during COVID for prescribing ivermectin if what you say is the law, where ivermectin actually—that because the CDC or somebody declared that was outside the scope of reasonable medical professional judgment. Your Honor— Would that have been unlawful, though, to do that? I'm not particularly familiar with that hypothetical. I don't know that it— It might have been a regulatory violation, but this says an agreement to unlawfully distribute or dispense outside the scope of professional practice. So it's not enough just to agree to distribute outside the scope of some regulators. It's got to be unlawful. Right. So what you did may or may not have been lawful according to the Supreme Court, but if you made it unlawful, you made it unlawful. Again, Your Honor, I mean, Ruan's holding again is— We're just going in circles. I went through this last time. Sorry. I'm happy to stay on this or move to the substantive count instructions and the government's argument on that. I mean, do you concede that it was error under Ruan? We do. We do. But the error does not satisfy the remaining prongs of plain error relief. We have—and I'll focus mostly on the prejudice prong. We have made the argument that in light of Ajayi's holding of the substantive count instructions, where you have the same conspiracy instruction here, it's not a clear, obvious error. But to focus on the prejudice prong of the plain error stand, it is, of course, Defendant Pierre's burden. If the Court agrees that plain error review applies, it's his burden to show an effect on his substantial rights. So he has to show a reasonable probability that a properly instructed jury would have acquitted him if it had been required to find knowledge or intent as to acting outside the scope of professional practice or without a medical legitimacy. And he can't do so for several reasons that in combination, I think, really preclude him from showing prejudice. First is the—and I'll summarize them and I'm happy to go back through them—is the overwhelming evidence in the government's view here that Defendant Pierre knew that the S. Parker Medical was really a front for dealing drugs. The second point is that the evidence specific to the particular prescriptions underlying the substantive counts—those are counts 2 through 8—the evidence particular to those counts show that those prescriptions bore all the hallmarks of illegitimate prescriptions, and it would have been obvious to Defendant Pierre. And the third is the jury's verdict on the properly instructed conspiracy count. We're not relying only on that verdict on the conspiracy count to show the absence of prejudice on the substantive counts, but it does matter for prejudice purposes because we know that the jury rejected Defendant Pierre's knowledge defense as to the properly instructed conspiracy count. We know, like, how it viewed the evidence in this case. So to circle back and just to touch on briefly, the evidence that Defendant Pierre knew that for drug dealing. First, you have the volume and pattern of prescriptions. As Judge Jones mentioned, it was more than 1 million pills that were prescribed. It is over a slightly longer period—it was a 13-month period—but over 1 million pills in 13 months were prescribed. More than 90 percent of the prescriptions were for 100 or more pills of hydrocodone. Over 99 percent of the hydrocodone prescriptions were for the strongest dosage then available—maximum strength. Then you have the testimony of the lead co-conspirator, Rhonda Walker, who ran—owned the clinic and ran it. She testified that Defendant Pierre knew that runners would bring patients to the clinic. She testified that Defendant Pierre reviewed the daily count log. The daily count log, our evidence showed at trial, showed that when a patient came and wanted hydrocodone, they got charged $220. When they wanted oxycodone, which has a higher street value, they got $500. So that difference in the price—$500 if somebody wanted oxy, $220 for hydro—that was in the daily count logs that Rhonda Walker said Pierre looked at. Then you have the testimony of Rhonda Walker and another co-conspirator, Henry Reese, about meetings that they held with Pierre before he joined the clinic. That testimony shows that Pierre went in with eyes wide open about what Wes Parker was. During the meetings, Walker described what her expectations were with respect to prescribing—with respect to, you know, the need to prescribe hydrocodone and Kerasopridol. What happened to Walker, by the way? She pled guilty, Your Honor, and she was sentenced. So she is currently in the custody of the Bureau of Prisons. How much was she sentenced to? I believe it was—it was lower than Defendant Pierre. I believe 120—I believe it was more than 10 years, Your Honor. 120 months is, in my mind, I may be off a little bit there. So she did get a significant sentence. I'm not misremembering the testimony, but was there testimony that Dr. Pierre asked about what the street price of one of these drugs was and said, I must not be charging enough? That's right. That's right, Your Honor. There was that testimony by Henry Reese as well. And, of course, you have all the evidence from all the patient files that were admitted. You have the government's medical expert who testified that the patient files were replete with sort of unsupported diagnoses, inadequate physical examinations, evidence of rampant drug-seeking behavior that would have been obvious from looking at these files, insufficient numbers of urine drug testing, you know, prior medical records were not obtained. And the government also introduced an undercover video, a video of an undercover officer who went into West Parker. And he was actually examined by Defendant Pierre. During his visit with Dr. Pierre, the physical examination that Defendant Pierre administered to the undercover, who was a new patient wanting hydrocodone, was one minute long. And Defendant Pierre still goes on to prescribe him hydrocodone. So that's the general evidence that Pierre knew that West Parker was a drug-dealing front. And then you look at the specific evidence pertaining to the prescriptions underlying counts two through eight. Now, counts two through six, five counts, were based on prescriptions issued to someone by the name of Charlotte Yarbrough, and she actually testified at trial. She testified that she was from Palestine, Texas, a three-hour drive from Palestine to Houston. And she testified that her husband was a runner, and her husband would bring herself and others from Palestine to West Parker to get prescriptions, which they named Phil, give to the husband who sold them on the street. And Ms. Yarbrough testified that when she went to West Parker, no one asked her why she couldn't find a clinic or a practitioner closer to Palestine. She was not given any physical examination except for being told to just bend over. And no discussion of the medications that were being prescribed to her. And you pair that with the medical expert's testimony about her patient file, which was that, you know, even though she's from Palestine, Texas, and that's a sign of drug-seeking, you know, potential drug-seeking behavior, no urine drug test was administered to Ms. Yarbrough. The expert also testified that there was no support for the medical diagnoses in the chart, and that there were sort of obvious sort of attempts by Yarbrough to exaggerate the pain she was in. And that's a testimony relevant to substantive counts two through six. Substantive counts seven through eight were based on prescriptions issued to someone by the name of James Campbell. He did not testify at trial, so the evidence pertaining to these prescriptions were based on his patient file and the medical expert's testimony about that patient file. And the patient file showed very clear evidence of drug-seeking behavior by Mr. Campbell before he came to West Parker for his two visits. He had been prescribed hydrocodone and carisoprodol by 13 different medical providers. In between his two visits to West Parker Medical, he's prescribed tramadol, another opioid, by someone who's not at West Parker, right? And that's a violation of his pain management agreement with West Parker. And so notwithstanding all those signs of drug-seeking behavior, no urine drug test was administered to Mr. Campbell. His medical records were not obtained to figure out why he's going to see all these other doctors. And the medical expert also testified that there were inadequate examinations that were performed on Mr. Campbell. My opponent referenced the testimony of the defense expert. The jury rejected that testimony in connection with the conspiracy count, which we believe was properly instructed on. And if the court reviews the testimony of the medical expert, he was a personal friend of Dr. Pierre. He testified that he'd known Dr. Pierre for 20 years. He testified that he felt responsible for Dr. Pierre's predicament because he was the one who referred Dr. Pierre to the recruiter that ultimately links him up to West Parker Medical. And if a court looks at record sites 1904 to 1905, which is where the defense expert gives his opinion about the prescriptions that were issued to Ms. Yarbrough and Mr. Campbell, so the prescriptions relevant to the substantive counts, and that's again 1904 to 1905, the defense expert's opinion that those were within the standard of care is very, I would say, completely conclusory. There's no delving into the patient files. It wasn't until cross-examination of the defense expert that the defense expert actually began to look at the patient files. So his testimony about the adequacy or the fact, his belief that those prescriptions were within the standard of care is entirely conclusory. And we know that the jury rejected it because it found that those prescriptions were outside the scope of professional practice and without medical legitimacy. I do see that my time is getting close to expiring. I'm happy to answer any additional questions the Court may have. If not, the government will rest on its brief and ask that the Court affirm. No, I guess we don't have any. Thank you very much. All right. Mr. Kelsey? The Supreme Court has spoken and this Court should faithfully follow that decision and should not add a new layer of complication. Do you agree that the conspiracy charge, distinct from the erroneous charge on the substantive count, do you agree that the conspiracy charge was properly done? No, the conspiracy charge is riddled with errors that are imported from the substantive count. I just said separate from the substantive count is the conspiracy charge. Is there any error in the conspiracy charge? Well, for me, the conspiracy, it includes the unlawful purpose, right? And I think what Your Honor was asking earlier was that there could be a law that is somehow separate from the erroneous substantive law, which they're unlawfully agreeing to, but I think the charge precludes that line of, I mean, I think it's this particular charge, unlike some other charges involving conspiracy, it's very tailored to the error. I don't see how it can possibly be extracted from it. I do think the Ajayi charge is black and white different. What is the difference in the conspiracy charge in Ajayi and the conspiracy charge here? Well, it's, one primary difference is that it doesn't have the disjunctive, so it could be, it's conjunctive, so you could have either the medical standard out of bounds or it could actually be the subjective intent. So the panel focused on this language in the conspiracy charge, that it required that a defendant know, quote, the unlawful purpose of the agreement. So this one does that. And also that he join, quote, in the agreement willfully, that is, with the intent to further its unlawful purpose, and this charge has that. So what's the difference with Ajayi? I think there's, there's a charitable way to read that paragraph. I don't think it holds up. I think lining up next to Khan, I think you have to take into account the other specific issues in Ajayi, which is why they said, well, this, we're going to limit this to the facts, because I just don't think, I don't think it's possible to read that commonsensically without, you know, going into the difference between the charge in Ajayi and the charge here. I mean, there's. You had a chart on this in your reply brief. Yes, Your Honor. I'm just pointing that out. I appreciate that. You stand on your brief, right? Yes, Your Honor. And I would just say this is a very important case. This is, I think, the first case that's squarely one doctor and effectively one charge, and it's premised on his intent. And so I urge the court to faithfully follow Rowan and the text of the CSA. And we respectfully pray that the court. You didn't mention it in your argument, but you're still hitched to your profile argument, are you? I mean, you didn't mention the profile business up here, but I take it you rely on what you said in the brief about that. I do. I would just, as a way of understanding that part, it's really the way the charge error, it's compounded because it shows how the objective standard charge permeated the entire trial. It was a plain error which was structural, it was fundamental from the first word of the oral argument to the end. And it was kind of perpetuated through this repetition of the regulatory, the usual course of practice, which is not in the statute, and this profiling, which is kind of compounded on top of that regulatory language. So, thank you. Okay, thank you, sir.